## AS TO REVOCATION OF THE RIGHTS OF A STREET RAILWAY COMPANY.

Common Pleas Court of Cuyahoga County.

THE WOODLAND AVENUE & WEST SIDE STREET RAILROAD COMPANY v. THE CITY OF CLEVELAND ET AL.

*Street Railways—Franchises of—Provision Requiring the Company to Re-pave a Certain Portion of the Street—Was the "Devil Strip" Included?—Recognition of Rights Claimed by Railway—Municipality may Summarily Interfere with Operation of Road, When—Irrevocable Character of Contract Embodied in Franchise—Disregard of Conditions—Injunction.*

1. The acts and conduct of the municipality in this case amounted to a recognition by it of the rights claimed by the street railway company to maintain its tracks in the streets as to which it is now claimed no franchise was granted by the renewal ordinance.

2. It is competent for a municipality to summarily interfere with the operation of a street railway, where a reservation of the right so to do has been made and the grounds for so doing are legally sufficient.

3. But the irrevocable character of the contract embodied in a street railway franchise which has been accepted by the company, binds the municipality to the agreement then made, and forbids the application of provisions embodied in ordinances and regulations thereafter enacted, unless such ordinances and regulations have reference to governmental matters.

4. Under the testimony offered in this case an injunction is warranted against interference with the operation of the street railway because of the refusal of the company to comply with the demands of the municipality as to the width of the strip in the street which it shall re-pave, including the "devil strip."

HAMILTON, J.

The case of the Woodland Avenue & West Side Street Railroad Company against the city of Cleveland, George W. Gardner, mayor, and J. W. Schmitt, superintendent of police, is before the court upon an application for an injunction.

In brief, the allegations of the petition are that the Woodland Avenue & West Side Street Railroad Company is the successor of the Kinsman Street Railroad Company, which was chartered many years ago, and that in 1879, on the expiration of the char-

ter of the Kinsman Street road after a lapse of twenty years for which it was originally granted, a renewal ordinance was granted, and, by the terms of the renewal ordinance, it is said that it was provided that—

"Whenever it shall be deemed necessary to grade, pave or improve any of the streets wherein said tracks are laid, the company shall be required to pave any part or all of the track between the rails with gravel, stone or other pavement as the council may deem proper, and, if said company, after reasonable notice, shall fail to do such paving at the same time with any such street or streets so being so improved by said city, or at the time named in such notice, then said city may do such paving and assess the cost of such paving against said company in the same ordinance with the property owners on said street, or by a separate ordinance, and may collect the amount thereof by suit or otherwise, according to law, and said company is also required to keep said pavement in constant good order; and paving and repairing to be done under the direction of and to the acceptance of the board of improvements."

It then avers that it has at all times complied with the provisions of the ordinance under which the renewal of the grant was effected. It further avers that in 1889 the city came to the conclusion and so expressed itself by way of resolutions and ordinances, to again pave Woodland avenue, between Wilson avenue and East Madison avenue; that they passed the necessary ordinance to repave, and required thereby the plaintiff company to pave between the rails—to pave its track between the rails of its tracks, and assessed upon the property owners adjoining this street sufficient to pay for the improvement, less the space between the rails; that is, less the intersection which the city at large would pave; that the money was paid into the treasury by the property owners, and that the plaintiff company paved its tracks as required, or substantially did so—perhaps it is not quite completed in all respects as yet; that some time in June, 1890, the city passed another ordinance, by which they amended the assessing ordinance, and therein provided that this street railroad company should pave not only its track between the rails, but should pave what is known as the "devil strip," the space lying between its two tracks.

Against this action of the council they protest and insist

that by the terms of the contract as provided in the renewal ordinance, they were only. bound to pave their tracks between their rails, and that the city has no authority or right to require more of them; this renewal ordinance being an ordinance which was accepted by the plaintiff company and was, by its terms, to continue in force for twenty-five years; that it is, therefore, a contract between the city and this plaintiff company and can not be abrogated by the city; but the city claimed this right and, having passed such an ordinance, and the railroad company refusing to either pave this additional strip itself or to pay the cost and expense of it to the city, the city then passed a resolution forfeiting the rights of this plaintiff company under its charter or under the ordinance renewing its rights, until such time as the company should comply, and directed the mayor to issue his order to the superintendent of police to prevent the street railroad company from running its cars, or in any manner using this strip of ground for the propelling of its cars over it, until it complied with the provisions of this ordinance by paving or paying for the paving of this disputed strip of ground. It says that all this was in violation of the rights of the company, and that it is a substantial interference with the contract rights of this company; interferes with its business, breaks it up, and interferes with and discommodes the patrons of this railroad company who are in the habit of using this road for going over this space or territory, and hence it asks an injunction at the hands of this court to prevent this state of things continuing.

The city, by way of answer, admits that there was a renewal ordinance in 1879 granted to this company or its predecessors; admits the passage of the ordinance of 1889 for paving this street; admits the passage of the ordinance in June, by which it required the plaintiff company here to pave this "devil strip," so-called, and admits the passage of the resolution by which it seeks to forfeit the rights of the company for non-compliance with that ordinance, and admits the taking possession of this road by its officers, the police force of the city, and the preventing of the running of its cars. It however denies that the plaintiff company has the contract rights which it claims, and expressly claims that this renewal ordinance was subject to the

general railroad ordinance passed for the government of all the railroads, and that, by its provisions, and by the provisions, perhaps, of the ordinance of renewal itself, it was to be subject to all future legislation of the city in respect to that road.

They further say that, by the provisions of the charter, ''charter'' so-called (it is merely a contract relation, this ordinance of 1879) it was therein provided that, on failure to comply with the ordinance and with the former ordinances, the general ordinances, then the city reserved to itself the right to pass a resolution declaring a forfeiture of the rights of the railroad company to run its road and to take posession and prevent the exercise of its rights. There is no controversy as to the fact that they did pass an ordinance originally; that is, the ordinance of 1889, for the repavement of this street, requiring the railroad company to pave the space between its rails or its tracks, and that subsequently they passed this requirement that it do more than that, to-wit, pave the ''devil strip.''

They further say that, whether that be so or not, there was a settlement and adjustment of all this controversy between the city and its officers and this plaintiff company, setting out that there was still another ordinance passed than the one mentioned in the petition, to-wit, an ordinance just prior to the one in June, which required the paving of the tracks themselves and the ''devil strip,'' but there had been an ordinance passed just prior to that, some time perhaps in April (April 21, 1890), by which the city required it to pave not only its tracks and the devil strip, but a foot outside of its tracks, making a space of sixteen feet instead of fourteen feet as was finally compromised and agreed upon; and that that being the condition of things, a law having been passed on April 21st, 1890, by the Legislature of this state, authorizing them to so tax in reference to these pavements all railroad companies in the city, in pursuance of that authority, they passed that ordinance, and, having thus passed it, that the railroad companies of the city protested. That ordinance was passed not only in reference to this road, but an ordinance was passed in reference to certain other roads in the city, requiring them to pave sixteen feet; that by a compromise between the owners of the adjacent property and the city authorities and this railroad com-

pany, this whole subject was discussed before the judiciary committee and the committee on taxation, and it was agreed that the city should recede from its demand that they should pave sixteen feet, and might pass an ordinance with their assent, the assent of everybody interested, requiring them to pave fourteen feet. The other railroad companies have carried that out in good faith, but this railroad company refuses to carry out this agreement.

It further avers in its answer (or desired to so amend; whether it has formally been done or not, it was allowed to be done) that this railroad company never had an ordinance passed, no ordinance was ever passed giving this company the right to lay its track from Willson avenue to East Madison avenue; that there was no ordinance upon the subject at all, and they possessed no right, therefore, to cavil about terms, for they do not have any grant at all over that road. There is a general denial of all these allegations by way of reply on the part of the plaintiff.

First, as to this failure of a grant. I am inclined to think that there has been a recognition by the city of the right to lay down its tracks and to use them from Willson avenue to East Madison avenue. Some years ago this road was macadamized. This company then occupied that territory by its rails. It then paved, or bore its portion of the expense of paving and macadamizing that street, and perhaps, to the full extent of covering the track and this "devil strip." That was under a prior ordinance. It was therefore a recognition by the city. The city again recognized it when it passed the ordinance of 1889 by which it repaved this street, requiring it to bear an expense, and it has recognized it all the way through by every one of these ordinances, and, in the provisions of the renewal ordinance, I find there was a reference to this very territory, for they undertook to describe where this railroad is to run, and they get it on to Woodland avenue, and "hence through said avenue to Madison avenue, subject to the following conditions and limitations." So that it is contained in the renewal ordinance of 1879, and authority is granted there to run over that territory, and I apprehend, there is no serious difficulty in that part of the case.

But, coming to the provisions of the contract itself, it is said that, by this renewal ordinance of 1879, it was made subject to the future legislation of the city. And again, in Section 8 of this renewal ordinance, all rights vested in the city council, the trustees of water works and gas company in respect to the care and improvement of the streets are expressly reserved, and are in no wise to be interfered with or curtailed by this grant. Again, in Section 14—

"That, in case of failure by neglect or otherwise on the part of said Kinsman Street Railroad Company, its successors or assigns, to perform all and singular the conditions of this ordinance, together with all and singular the general ordinance and the future ordinances of the city in relation to said road, the privileges hereby granted and renewed shall become void and of no effect, and shall cease upon the adoption of a resolution of council to that effect."

That seems to be a provision in reference to the enforcement of the ordinance. That, in case of neglect or otherwise on the part of this company, its successors or assigns, to perform all and singular the conditions of this ordinance, then what may be done. It is not exactly an enacting clause, expressly reserving in so many words, but by fair implication, perhaps, it is assumed that it refers to the former ordinance and makes that part of it. By the old ordinance, the general railroad ordinance, in force at that time, Section 1 provides (the court here read Sections 1, 4, 13 and 14 of said ordinance).

Now, if it be true that this renewal ordinance places them under the guidance and direction of the general ordinance of the city, the language of that old railroad ordinance is certainly broad enough to imply and to carry with it authority for the city to do all they seem to have done or required in this case.

Upon the subject of contract relations, there can scarcely be a doubt that when an express contract is made between the city and a railroad company in reference to its streets, and that contract is accepted by the railroad company for a definite period of time, that that makes a contract—that we can ascertain what that contract is—that is inviolable and must be recognized, and can not be done away with simply by the action of the city, unless they have expressly reserved to themselves rights so

to do. The work of Elliott on Roads and Streets, page 564, contains this language: "It is the prevailing opinion that an ordinance is an irrevocable contract when it is accepted by the company." Again, on page 565: "What the Legislature grants to the street railway company can not, however, be taken away or abridged by the municipality." That is undoubtedly true, as a general proposition of law.

"That the contract obligations between the city and parties occupying the streets are the same that they are between any other parties, and yet there are certain rights which the city may legally and properly reserve to itself, and, perhaps, certain things which they can not reserve, to-wit, the governmental care and control which is placed in the hands of the city as a representative of the state, alienate or give away."

That is undoubtedly true.

This doctrine of contract relation has been recognized, as has been said, in the 29th Ohio State, but there was an express provision in the ordinance itself that there should be a contract relation existing between them, and their rights should be contract rights, yet the general proposition can not be denied, I think, that the obligations of the contract must be regarded. Now, the question is, what was this contract?

It is perfectly manifest and clear that, by this renewal ordinance of 1879, this company was required to pave the tracks between its rails. Some argument has been made by the city in this case, from the language used, that it might reasonably be supposed that between the tracks meant everything occupied by the company, inasmuch, for instance, as the rails are laid upon ties and these ties extend outside of the rails, that that is a part of its track, and that a fair interpretation of it covers the whole ground which they use, but I think a careful perusal of the language of this ordinance and the ordinance as worded speaks of between the rails, "its tracks between its rails," must exclude anything outside of them. The city certainly so interpreted it in making its assessment, and that, it seems to me, must be a fair interpretation of it.

Now, when this original assessment, or this original ordinance was passed, both the renewal ordinance and the ordinance assessing for this other pavement, the track between its rails,

the general law of this state, as passed by the Legislature, recorded in Section 2504 of the Revised Statutes, provided that the city of Cleveland, or cities generally, might require a street railroad to pave its tracks between its rails, and that is all that it provided for. That was the language of the act, and, in pursuance of that act, as it then stood upon the statute book, this renewal ordinance was passed, following the language of the statute. In pursuance of it, this assessment ordinance of 1889 was also passed, assessing the company for the pavement between the rails of its track, and it was thought necessary to go to the Legislature before anything else could be done and get an act passed by which cities were empowered, or this city, being a city of the second grade of the first class, only was empowered to charge railroads with sixteen feet of this space—make them pay for that; that the railroad and the city could agree in pursuance of this general act when it was passed—the old general railroad ordinance which I have read, passed prior to the renewal of this ordinance, and under which it is claimed that they are now operating, or that this road is now operating by the terms of the renewal ordinance; provided something over and beyond what the statute at the time permitted to be done, to-wit, sixteen feet. There is no doubt about that, and yet if a railroad company should agree with the city to adopt that, that being a subject of contract, there is no question about the obligation to perform just that thing; but in the absence of any agreement upon the subject, I am apprehensive that the city authorities would have the right to compel it to pave just what the law permitted them to so compel them to pave; that the act itself, the ordinance, went beyond the limitation of the law at that time I have no doubt, and yet, if they have come in and said that it would be the subject of contract relation, they must abide by it.

Now, getting back to the contract itself, with this state of the law, they did contract when they renewed this ordinance to pave the tracks between the rails, and that only. This contract was to be in existence for twenty-five years, and I am inclined to think that that is all they did contract for, and that it granted a contract obligation, notwithstanding the language of the general ordinance that future legislation might be had in reference

to this road.  That future legislation could be had and was had and properly, there can be no controversy in reference to all governmental matters, all police regulations and all sanitary matters, all matters as to how many cars they should run and as to what fare they should charge, all these things were subjects that the city might properly legislate upon.  But when we find an express agreement as to how much of this track shall be paved, then, notwithstanding the general ordinance, the old one, provided for a greater space, it seems to me that that must control in the case.  Take this very Section 14, and it provides that, in case of a failure by neglect or otherwise on the part of said Kinsman Street Railroad Company, its successors or assigns, to perform all and singlar the conditions of this ordinance, together with all and singular the general ordinance and the future ordinances of the city in relation to said road, the privileges hereby granted shall become null and void on the passage by the council of a resolution to that effect.

It is perfectly patent that it was not designed that they should comply with both of those ordinances, one requiring sixteen feet and the other requiring the space between the tracks, ten feet, more or less, and it was not intended that there should be a forfeiture if they did not comply with both, two inconsistent things.  When they specially legislate as to how much they may or shall be required to pave, the language being "whenever it shall be deemed necessary to repave," then they shall be required to pave so much, it seems to the court that that is conclusive upon the city, and that the general provision does not apply to a case of that kind.  As I have already indicated, it was a provision beyond what the law would permit them to make, in the absence of an agreement at the time, and, it seems to me entirely conclusive, that when it refers to the future legislation, the future ordinances of the city, it is in reference to all those legislative matters such as governmental matters, police and sanitary regulations, regulations as to fare, etc., and all those things necessary to come within the scope of this future legislation that is referred to, and there can be but one conclusion to be arrived at, taking the whole body of these two things together, and that is that they did agree that amount and that only should be paved by this railroad company for the space of

twenty-five years. It may or it may not have been a good contract. That is a matter with which the courts have nothing to do. Such it seems to the court they have done; have made such an agreement in view of all these facts.

I have been referred here to numerous ordinances, dealing not only with this Kinsman street railroad, but with the West Side street railroad, under which certain extensions were granted and certain conditions imposed, and that they should manage these extensions in pursuance of these ordinances. I do not see that they affect the general rights of the company under this ordinance.

In reference to the proposition that the street railroad company can not be interfered with and stopped by the city authorities in this summary manner, I do not believe that objection is well taken. 'If I could have found that this ordinance was subject to the general ordinance, and subject to the power of the city to legislate at any time when it saw fit, then I think that the reservation of this Section 14 and the provisions therein made that they could, on the passage of a resolution, forfeit this license and this right of the company, it would be perfectly legitimate for the city to do exactly what it did do, for they were right about it, notwithstanding the proposition that has been urged here that there is something in the passage of this act after the ordinance had been passed for the assessment; that it was then a pending proceeding, and that a legislative act or expression repealing it, etc., would be informal and invalid, and would not affect it. I do not think they were necessarily a party to that proceeding, and with this reservation expressly contained in the charter that they might do this thing, that that provided exactly what the city could do.

There is only one remaining subject, and that is one upon which the court has had more doubt than any other, and that is upon the subject of this adjustment and settlement.

If this railroad company, on the passage of that ordinance No. 1169, by which they were required to pave sixteen feet (whether it was a legitimate ordinance, or a proper ordinance, it was a claim made by the city, and they [the railroad company] claimed the other way—and it seems that there was an ordinance passed in respect to certain other roads—of course, what

the rights of the other roads were or what their ordinances were, or whether their rights were the same as those of this company is not upon inquiry, and is not a proper subject of investigation here), but if these people came down and made a stipulation that they would pave fourteen feet, and another ordinance, 1169, passed some time in April, was amended and changed into the ordinance known as 1202, by which, instead of sixteen feet, they were required to pave fourteen feet, and they stood by, consenting to that, waiting perhaps until the city had refunded a portion of this fund that had been collected of the property owners, they stand in no position to come into a court of equity now and say, though that occurred, that it was not legal and therefore they won't fulfill it. If I should find that state of things to exist, I should dismiss this petition at once.

How stands the proof in reference to that? It is said that these two committees of the council were in consultation, in joint session, and that Mr. Mulhern, the superintendent of this railroad company, came over; that the counsel of the railroad was also present; that they were objecting to the legality of this ordinance, which undertook to require the company to pave sixteen feet; that the property owners were also there. They, of course. were interested in it, and they were in contending for the existence of the ordinance as it then stood, requiring sixteen feet; that it was then said that, if fourteen feet was the measure that they should pave, that there would be no objection to that, and they would proceed and do it. Now, that was so represented, it is claimed, to this committee, and that the committee, in pursuance of that arrangement, reported an ordinance recommending fourteen feet to be paved; that the city solicitor, it is said, in pursuance of such an undertaking, reported in favor of making the space fourteen instead of sixteen feet, thus amending the ordinance, and stated in his recommendation to the council, officially, that it had been agreed upon between all parties and that the council, proceeding on that supposition, had acted and passed this amended ordinance, requiring fourteen instead of sixteen feet of paving. In proof of that, we have the affidavits of some six or seven parties, property owners, the chairman of this joint meeting, Mr. Davidson, and an assistant city solicitor who was present, making such a

statement that such an understanding was come to; that Mr. Mulhern so represented, and that these recommendations were made upon the strength of that statement in connection with the same thing being gone over with the other roads. On the other side, it is said by Mr. Mulhern that he made no such statement; that the most he did say was he was there and counsel for the road was there, protesting against it, and insisting that they were not bound to pave but ten feet instead of sixteen; that he continually protested about it; that after the committee had gone into secret session and came out, he immediately went to one of the committee and asked what had been done. This one of the committee to whom he was thus speaking responded that they had agreed upon a compromise of fourteen feet. Mr. Mulhern then immediatly said to him that the road would in his opinion contest that. We have the affidavit of that member of the committee, who says that was what took place. Mr. Mulhern did so state to him. The most that Mr. Mulhern says he did do about it was that when this matter was upon its passage in the council, somebody asked him if he was going to contest it, and he said "no," believing, as he supposed, that it having been thus recommended and talked over, that they would pass it anyhow, but it was always the intention of his road, so far as he knew, to contest the legality. We have the affidavit of Mr. Mulhern also upon the subject that he had no authority to make such a compromise; had been instructed exactly the reverse all the time. We have the affidavit of Mr. Hanna, the president of the road, Mr. Emery, the vice-president of the road, Mr. Hanna, the secretary of the road, and all of them say that Mr. Mulhern's duties do not lie in that direction at all; he had no authority whatever about it, and that they had instructed their counsel at all times to contest the validity of this matter to make them pave more than the original ordinance required, to-wit, ten feet. We have also the affidavit of two of the judiciary committee. They say there was no understanding, so far as they know; heard no such thing; no such agreement was made so far as it came to their knowledge. We have two of the tax committee, who were in joint session at the same time, two members of that committee, who also testify to the same thing.

While it is entirely unsatisfactory to test questions of fact upon affidavits without having the witness'before you and subject to a cross-examination, I have come to the conclusion that I can not find, in view of all the facts in this case, that there was a definite understanding and an authorized understanding made by which they consented to this compromise and arrangement. It may be that it will appear they have done so, when the witnesses are got into this court, when the facts can be developed as they really are, and then perhaps we can find out what the real fact is; but it is for the city to establish that; the burden is upon it to prove that this settlement and this adjustment was made. I am unable to say it has been so established by the evidence.

It is said here that this railroad company took out a permit to do this work under this ordinance, and that it did tear up a space substantially covering not only the fourteen feet, but the sixteen feet. They were required to move the tracks and confess to that themselves; that they went down to the city civil engineer for a permit, and, when they asked for it, he issued one, saying that they should pave the "devil strip" as well as between the rails. Of course, that was wholly unnecessary. All that he could say about it was to give them a permit to pave in accordance with the ordinances; just what they required; he could not interpose anything in it that was not in the ordinances themselves. Well, upon that being placed in it, they objected and would not take the permit, whereupon the civil engineer struck out the words "devil strip" and they took it in that shape, and went on to do this work. They were required to move these tracks in advance of the paving. The only bearing that can possibly have had upon the rights of the city is to throw light upon the contention here as to whether there was a settlement or not, showing that at that date they were contesting and that all the time they were contesting the right of the city to require them to pave more than the ten feet.

It is said further that they dug out a large space from between the tracks. It is, at any rate, described as all dug up, and that they did this in pursuance of this arrangement to lay down this tracks; that shows the fact that they so understood it. We have not had very much testimony as to that. We have had some

statements, *pro* and *con*, that the water works commissioners did it, laying down a pipe, * * * and, on the other hand that they did not have anything to do with it; that they laid it down outside of the "devil strip" entirely. We have not had any evidence on that subject that the court can take action upon. But, it is contended, at least, that they disturbed the "devil strip" more or less, and they say that they did not think it necessary to put that in repair again because the paving contractor was following them up; therefore, there is no requirement for us to put it back. If it was a question as to whether he had torn up the street, and was obliged to put that back again in condition in which he found it, we would undoubtedly do it. But that is not the question here; the question is whether he was required to pave this strip.

Now, in view of these facts (I have gone over it at much greater length than I had anticipated I should do when I started to give my views on this matter, but it seems to have been necessary to go over a good deal of ground here), I have finally come to the conclusion that a temporary injunction must be granted in this case, and such will be the entry.